UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

Valerie A.,[1]                              )    Civil Action No. 5:22-cv-1250-KDW
                                           )
                          Plaintiff,       )
                                           )
vs.                                        )
                                           )              ORDER
Kilolo Kijakazi, Acting Commissioner       )
of Social Security Administration,         )
                                           )
                          Defendant.       )

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act").

Having carefully considered the parties' submissions and the applicable law, the court reverses

and remands the Commissioner's decision for further action for the reasons discussed herein.

I.      Relevant Background

        A.      Procedural History

        On October 29, 2019,[2] Plaintiff protectively filed an application for DIB alleging a

disability onset date of October 8, 2019. Tr. 155-56. Her claim was denied initially, Tr. 76, and

upon reconsideration, Tr. 93, and Plaintiff requested a hearing, Tr. 108-09. On December 7, 2020,

a hearing was held before an Administrative Law Judge ("ALJ"). Tr. 34-62. During the hearing,

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Although the Application Summary is dated November 1, 2019, Tr. 155, Plaintiff's protected filing date, as indicated in the Disability Determination and Transmittal is October 29, 2019, Tr. 76.

testimony was taken from Plaintiff, who was represented by counsel, and from a vocational expert ("VE"). *Id.* On January 22, 2021, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 7-22. Plaintiff requested review of the decision from the Appeals Council. Tr. 152-54. The Appeals Council denied Plaintiff's request for review on February 18, 2022, making the ALJ's decision the Commissioner's final decision for purposes of judicial review. Tr. 1-5. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed April 18, 2022. ECF No. 1.

      B.     Plaintiff's Background

Born in 1976, Plaintiff was 42 years old on her alleged onset date of October 8, 2019. Tr. 175. In a Disability Report-Adult form from November 2019, Plaintiff noted that she completed high school, did not attend special education classes, and had not completed any type of specialized job training, trade or vocational school. Tr. 180. She listed her past relevant work ("PRW") as manufacturing data entry/administrative assistant (2004-2006), customer documentation (2007-2008), executive assistant (2010-2015), and verification/scheduling specialist (Jan. 2016-Oct. 8, 2019). *Id.* Plaintiff indicated that she stopped working on October 8, 2019, because of her conditions, which she listed as bipolar disorder, PTSD, fibromyalgia, and anxiety and nerve pain. Tr. 179. Plaintiff indicated that she was 5'3" tall, weighed 165 pounds, and her conditions caused her pain or other symptoms. *Id.*

A Disability Report-Appeal dated March 12, 2020, and completed by her attorney, indicated a change in Plaintiff's condition that occurred in February 2020 described as bipolar mixed episodes and "Fibromyalgia increased pain in new areas along with more prolonged flares." Tr. 209. The attorney noted new medical conditions of left wrist ligament strain in January 2020,

and right hip ligament strain in February 2020. *Id.* Plaintiff noted the following changes to her

daily activities due to her physical and mental conditions:

> Unable to do light housework for more than 5 minutes; mixed episode of bipolar symptoms has worsened – more nightmares, anxiety and mixes between depression and mania, places I have frequented before no longer comfortable, feel safe or able to go to alone. Unable to sit for more than 45 minutes at time due to fibromyalgia pain (increased in legs/lower back); increased mixed episodes with bipolar has increased anxiety causing increased physical agitation which in turn is causing increased physical pain which causes increased depression; mania/depression and back cycling more frequent – causes fear which causes anxiety. These things are affecting my abilities to function daily – examples are: worsening anxiety in leaving home alone for anything other than appointments due to fears of being in large crowds or that everyone is watching me and knows all my secrets and problems.

> Worsened pain making it more difficult to get out of the house or do things around the house and the fatigue and brain fog going along with the fibromyalgia is causing me to have more trouble remembering and keeping track of my appointments. Ongoing medication changes for my mood stabilizers have been frequent over the last few months causing more anxiety and fear around effects. I am unable to work due to the following reasons: Fibromyalgia, Nerve Pain, Bipolar Disorder, PTSD, and Anxiety. I was at Marshall Pickens in September 2014.

Tr. 214.15.

A subsequent Disability Report-Appeal completed by Plaintiff's attorney and dated August

20, 2020, indicated changes in Plaintiff's condition that occurred in July 2020. Tr. 238. These

changes were described as: "Unable to function for daily activities. Increased sleep disturbances.

Sleeping more during the day and wake up more frequently at night. Racing thoughts. Increased

frequency and pain from migraines." *Id.* Plaintiff noted the following changes in her daily activities

due to her physical or mental conditions: "Less ability to complete household and daily tasks. Such

as laundry, light cleaning and child care. Extreme fatigue and migraines complicate these things.

More of a lost [sic] of interest and enjoyment from social activities." Tr. 242.

C.      Administrative Proceedings

3

Plaintiff appeared with counsel for her administrative hearing in Greenville, South Carolina on December 7, 2020. Tr. 34. VE Michelle McBroom-Weiss also appeared and testified. *Id.* Due to the extraordinary circumstances of the Covid-19 pandemic, the hearing was conducted by telephone. Tr. 36.

       1.   Plaintiff's Testimony

In response to questions from the ALJ, Plaintiff confirmed her birthdate and testified she was 5'2" tall and weighed 188 pounds. Tr. 41-42. Plaintiff testified that over the last six or eight months she had gained 15-to-20 pounds. She attributed the weight gain to "[s]tress eating" and indicated stressors included decisions about moving to Florida, and stressful situations with her ex-spouse and with finances. Tr. 42. Plaintiff confirmed that she was living in Simpsonville, S.C., and that the family no longer planned to move to Florida because of changes in her spouse's company's work policy. Tr. 43. Plaintiff testified she lived with her spouse and their three-year-old twins, along with her mother-in-law who has lived with them since 2018. *Id.* Plaintiff testified that she graduated from high school, completed one semester of college, and had no certifications. Tr. 44.

The ALJ questioned Plaintiff about her previous employment starting with XM International where Plaintiff worked from 2005 until early 2007. Tr. 44-45. Plaintiff testified that the company was in the fastener industry and sold nails, screws, etc. to contractors. Plaintiff stated that she did data entry work ordering parts or handling returns. Tr. 45. The ALJ asked about self-employment work in 2011 and 2012. *Id.* Plaintiff testified that she worked for a company called Smart Work Network where she started as an executive assistant and later took on additional duties in a client services role. *Id.* She stated the client services role was assisting people over the phone with training and support for the online job search platform. Tr. 46. Plaintiff stated the job was

listed as self-employment because she was paid on a contract basis. *Id.* The ALJ asked about her work for Ideal Business Solutions from 2016 through 2019. *Id.* Plaintiff testified she worked with federal financial aid. Tr. 47. She started in the verification area where she verified documentation, and then became a payment specialist where she handled "making payments for the students and sending those out via online." *Id.* Plaintiff confirmed that the position was primarily a clerical one. *Id.* Plaintiff confirmed that her alleged onset date, October 8, 2019, was her last day of employment with Ideal Business Solutions. Tr. 48. Plaintiff testified that her psychiatrist stated that she "needed to take a break from work . . . because [she] was having a lot of trouble with concentration, with focus, a lot of up and down mood swings." *Id.* Plaintiff stated that the company was small and did not offer any type of short- or long-term disability. *Id.* Plaintiff testified that the day after she received the notification from her doctor, she was laid off. Plaintiff believed the decision on layoffs had already been made, and it coincided coincidentally with her need to stop working. Tr. 49. Plaintiff testified that at that time her primary issues were with her mental health and they had gotten worse. *Id.* When asked to explain, Plaintiff testified that her depression worsened due to losing her job and financial worries, and her mood swings worsened which, with her bipolar issues, went directly to her physical issues and chronic pain. Tr. 50. Plaintiff testified she would be unable to return to clerical or administrative type work because of her "[d]ifficulty with concentration, focus, being able to problem solve and stay clear headed." *Id.* Plaintiff affirmed that she was experiencing these issues in her daily life and as an example stated that she could be "in the middle of washing dishes, and [her] mind starts wandering. Racing thoughts come in, and [she] get[s] flustered and . . . have to walk away [and] just go do something else or just sit." *Id.* Plaintiff stated that her racing thoughts are sometimes triggered by interactions with her ex-spouse, but other times there are no explanations for it. Tr. 51. Plaintiff testified that she also would have problems

returning to clerical/administrative type work from a physical standpoint. *Id.* She testified she has a lot of nerve pain in her left arm that would make it difficult to type "because it hurts [her] fingertips and shoots all the way up into [her] arm." *Id.* She stated that sitting for any extended period causes her to "get very stiff and have a lot of pain in [her] joints. There's a lot of having to get up and move around in order to . . . relieve that." *Id.* Plaintiff stated that in addition to the left arm pain, she has "an overall pain in [her] back when just sitting still." *Id.* Plaintiff confirmed that her left arm pain is worse than the right, and she is right-handed. Tr. 52. She stated her back pain is "[m]ainly between [her] shoulder blades and [her] lower back." *Id.*

In response to questions from her attorney, Plaintiff testified that mostly her mother-in-law cares for the twins while her wife is at work. Tr. 52. She stated that her mother-in-law and her wife do the housework. *Id.* Plaintiff affirmed that she does not get restful sleep and she sleeps for two-to-three hours during the day. Tr. 52-53. Plaintiff testified she can walk comfortably for 15 minutes, sit in a straight chair for 10-15 minutes, and stand for "only about five minutes." Tr. 53. Plaintiff stated she cannot lift over five pounds with her left hand and ten pounds with her right hand. She stated she can lift only ten pounds with both hands in combination "with most of the weight going into [her] right and [her] left just being there for support." *Id.* Plaintiff stated she does not drive typically, other than to a doctor's appointment; otherwise, her spouse drives. *Id.* Plaintiff testified that she does not drive because she does not "feel safe, between medication side effects and . . . paranoia of the traffic and being able to . . . pay attention and get where [she] need[s] to go without having an accident." Tr. 54. Plaintiff stated that she agreed with the assessment from a Social Security psychologist that her endurance over the course of a workday would be poor because of anxiety and social discomfort. *Id.* Plaintiff confirmed that she did not think she could maintain persistence, concentration and pace for two-hour blocks of time to be

able to function in a work environment. *Id.* Plaintiff testified that she typically does not leave the house other than for doctor's appointments or to travel to see family. *Id.* Plaintiff confirmed that she contemplated moving to Florida because she thought the warmer weather would help with her pain. Tr. 55. Despite having injections and nerve blocks, Plaintiff testified that she has not found anything to give her sustained relief from her pain. *Id.* Plaintiff stated she has "very little" ability to control her emotions and with her bipolar disorder she spends more time depressed rather than manic. *Id.* She stated that when she is in a depression cycle, she does not function and her "mother-in-law does pretty much everything." Tr. 56. Plaintiff stated that in one month she has severe depression for half of the time. *Id.* She stated that her doctor stopped her from working based on the combination of depression and anxiety. *Id.* Plaintiff described the side effects from medication as feeling "very drowsy and tired. . . . very groggy, foggy headed, like a medicine head kind of feeling [and] very tired." Tr. 56-57.

2.   VE's Testimony

The VE described Plaintiff's past work as data entry clerk, Dictionary of Occupational Titles ("DOT") number 203.582-054, sedentary, semi-skilled, SVP 4; executive assistant I/secretary, DOT number 201.362-030, sedentary, skilled, SVP 6; help desk representative, composite, DOT number 032.262-010, sedentary, skilled, SVP 7; and administrative clerk, DOT number 219.362-010, light, semi-skilled, SVP 4. Tr. 58. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past jobs who was limited as follows:

> the individual is limited to light exertional level, occasional climbing of ramps and stairs, never climbing of ladders, ropes or scaffolds, frequent balancing, occasional stooping, kneeling, crouching and crawling. No concentrated exposure to pulmonary irritants, or to hazards such as unprotected heights or dangerous moving machinery. No concentrated exposure to vibration. Can sustain concentration, persistence and pace for periods of two hours at a time with simple, routine tasks. Can have no customer service interaction with the public, but can have frequent interaction with coworkers and supervisors.

7

Tr. 58-59. The VE testified that hypothetical individual could not perform any of Plaintiff's past jobs but could perform other work such as production assembler, DOT number 706.687-010, light, unskilled, SVP 2, approximately 28,000 in the U.S.; small product assembler, DOT number 706.684-022, light, unskilled, SVP 2, approximately 22,000 in the U.S.; and marker II, DOT number 920.687-126, light, unskilled, SVP 2, approximately 28,000 in the U.S. Tr. 59. The VE confirmed her testimony was consistent with the DOT. Tr. 60.

In his second hypothetical the ALJ asked the VE to consider three additional limitations: if the individual would have three or more absences a month; if the individual would have 20% time off task in addition to normal breaks due to pain or the need for unscheduled breaks away from the workstation; or if the individual could not sustain concentration or persistence in two-hour blocks of time on a sustained basis over a 40-hour workweek. Tr. 60. The VE testified that if given any of those three limitations the hypothetical individual could not perform competitive employment. *Id.*

Plaintiff's attorney had no questions for the VE, but he noted in closing that Plaintiff "has been receiving consistent psychiatric care." Tr. 60. The attorney asked the ALJ to consider that Plaintiff "is not functioning sufficient from an emotional standpoint that she could maintain competitive employment." Tr. 61.

II.    Discussion

A.    The ALJ's Findings

In his January 22, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.     The claimant has not engaged in substantial gainful activity since October 8, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: fibromyalgia; asthma; recurrent arrhythmias; post-traumatic stress disorder ("PTSD"); generalized anxiety disorder; and affective disorder (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds; can frequently balance; occasionally stoop, kneel, crouch, and crawl; should have no concentrated exposure to pulmonary irritants, hazards, such as unprotected heights or dangerous moving machinery, or to vibrations; can sustain concentration, persistence, and pace for periods of two hours at a time with simple, routine tasks; and can have no customer service interaction with the public, but can have frequent interaction with coworkers and supervisors.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on [REDACTED] 1976 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 8, 2019, through the date of this decision (20 CFR 404.1520(g)).

Tr. 12-13, 15-16, 21-22.

   B.    Legal Framework

      1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5) whether

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed

the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to

---

impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

      2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the

Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

 C. Analysis

Plaintiff alleges the ALJ committed reversible error by (1) failing to afford adequate weight to the treating psychiatrist's opinions, (2) minimizing the evidence as to Plaintiff's physical conditions by not properly considering the longitudinal record, and (3) failing to reconcile the testimony of the VE regarding absences. Pl.'s Br. 3, ECF No. 12.

 1. Standard for Weighing the Opinions of Treating Physicians

For benefits applications filed on or after March 27, 2017, such as Plaintiff's, the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. § 404.1520c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources"). Instead, ALJs consider medical opinions using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. *Id.* § 404.1520c(b)(2). The new regulations further deem certain evidence "inherently

neither valuable nor persuasive." 20 C.F.R. § 404.1520b(c). This includes statements on issues reserved to the Commissioner such as whether the claimant is disabled, is unable to work, or is incapable of doing past relevant work. 20 C.F.R. § 404.1520b(c)(3).

In undertaking review of the ALJ's consideration of a claimant's treating sources, the court focuses its review on whether the ALJ's decision is supported by substantial evidence. Here, the ALJ stated that he "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c." Tr. 16. The ALJ discussed Plaintiff's hearing testimony and outlined the medical evidence of record regarding Plaintiff's treatment for her various physical and mental impairments during the relevant period. Tr. 16-19. The ALJ then evaluated the opinion evidence of the State agency psychological and medical consultants; consultative examiner Bruce Kofoed, Ph.D.; and treating psychiatrist Dr. Robert Richards. Tr. 19-20.

a. Dr. Robert W. Richards – Greenville Psychiatry, P.A.

Plaintiff contends the ALJ failed to properly evaluate the opinion of her longtime treating psychiatrist, Dr. Richards. Pl.'s Br. 4. On October 9, 2020 Dr. Richards completed a Mental Impairment Questionnaire prepared by Plaintiff's attorney. Tr. 949-51. Dr. Richards noted that he completed the form with Plaintiff. Tr. 951. He noted Plaintiff's diagnoses of Bipolar I Mixed and PTSD, that she was being treated with medication and therapy with inconsistent/partial responses, her medication side effects included dizziness and cognitive blunting, and her prognosis was guarded. Tr. 949. Dr. Richards indicated that Plaintiff experienced three episodes of decompensation within 12 months, noting that Plaintiff reported that she "can't function." *Id.* He also checked the boxes indicating that Plaintiff has a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the

environment would be predicted to cause the individual to decompensate" and indicating Plaintiff has a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." *Id.* Dr. Richards checked several boxes identifying Plaintiff's "signs and symptoms" including anhedonia, unstable interpersonal relationships, time disorientation, decreased energy, difficulty thinking or concentrating, and paranoid thinking among many others. Tr. 949-50. Regarding Plaintiff's functional limitations, Dr. Richards indicated Plaintiff had moderate/marked limitations in restriction of activities of daily living ("ADLs"); moderate limitations in maintaining social functioning; marked limitations in deficiencies of concentration, persistence or pace; and four or more repeated episodes of decompensation with a 12-month period each of at least two weeks duration. Tr. 951. Dr. Richards indicated that Plaintiff's impairments or treatment would cause her to be absent from work about four days per month. *Id.*

b. ALJ's Consideration of Dr. Richards' Opinion

The ALJ "considered the October 2020 opinions of Dr. Robert Richards, the claimant's psychiatrist" and found them unpersuasive. Tr. 20. He noted the following in support of his conclusion:

> Dr. Richards opined that the claimant has marked limitations in at least two of the B criteria, which would result in listing level severity of mental impairments (14F). However, this opinion grossly overstates the impact of the claimant's mental impairments and is not supported by the numerous relatively normal to mild mental status examinations throughout the medical record. Likewise, Dr. Richards used the prior listings and old B criteria in his analysis, despite his opinion being rendered in 2020. He also provided additional proposed limitations which are not supported by nor necessitated by any specific objective findings, such as a need for four or more absences from work per month (14F/3). The undersigned also notes that the claimant's own reported and documented activities, including going to the gym regularly and house hunting in Florida, would be inconsistent with the suggested listing level mental impairment. Therefore, this opinion is not persuasive.

*Id.*

c.   Discussion

Plaintiff asserts the ALJ failed to properly evaluate Dr. Richards' opinion. Pl.'s Br. 4. The Commissioner argues the ALJ applied the correct standard for evaluating medical opinions, while the Plaintiff does not and "attempts to bolster her psychiatrist's medical opinion by applying the 'treating physician rule' (Pl. Br. 4-5), which no longer applies under the applicable regulations." Def.'s Br. 12, ECF No. 16. The Commissioner is correct in stating that under the new regulations an ALJ is not required to articulate his consideration of all the factors. The new regulations require ALJs to explain how they "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the] determination or decision. [ALJs] may, but *are not required to*, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(2) (emphasis added). The (c)(3) through (c)(5) factors are: relationship with claimant, specialization, and "other factors" including "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [Social Security's] disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c). Although Plaintiff refers to the ALJ's failure to consider the *Johnson* factors[4], Pl.'s Br. 7, she focuses her argument on the consistency and supportability factors, as required by the regulations, Pl's Br. 7-17.

In assessing the ALJ's treatment of Dr. Richards' opinion, the court must examine what the ALJ actually determined. The ALJ first found that Dr. Richards' opinion that Plaintiff's mental impairments met listing level severity was "not supported by the numerous relatively normal to

---

[4] Plaintiff cites *Johnson v. Barnhard*, 434 F.3d 650, 654 (4th Cir. 2005), a case issued before the change in the regulations, that sets forth the factors to be considered under the Treating Physician Rule. Pl.'s Br. 5, 7.

mild mental status examination throughout the medical records." Tr. 20. Earlier in his discussion

of the objective medical evidence the ALJ noted the following:

> Despite persistent complaints of mental health symptoms, the claimant's mental status examination findings have generally remained somewhat unremarkable (1F; 6F; 8F; 9F; 10F). During a group therapy session in October 2019, the claimant was observed as having an euthymic mood, appropriate affect, and exhibiting appropriate behavior and good social interaction skills (1F/5). Notably, on October 29, 2019, the same day that the claimant's psychiatrist recommended considering filing for disability, the claimant reported that she had just traveled to and from Disney World for a vacation, where she had "been pushing it" physically (2F/6). In November 2019, the claimant presented with a normal mood, affect, and behavior (7F/38). While the claimant's primary care physician stated in December 2019 that "it has been rough for her over the past two weeks" psychologically, he also wrote that the claimant recently "joined a gym," exhibited no anxiety or mood changes, and "continues to be working to get herself stabilized from a psych standpoint" (8F/33-34).

Tr. 18. The records cited by the ALJ include group therapy notes from January-October 2019

from Patewood Psychiatry, treatment notes from Carolina Cardiology and Keystone Family

Medicine, Ex. 1F, Tr. 315-50; an October 29, 2019 treatment note from Piedmont Physical

Medicine & Rehabilitation, Ex. 2F/6, Tr. 356; Dr. Bruce Kofoed's February 2020 Psychological

Evaluation, Ex. 6F, Tr. 457-60; a November 2019 office visit note for urinary incontinence from

Keystone Family Medicine, Ex. 7F/38, Tr. 498; October 2018 – April 2020 treatment notes from

Piedmont Physical Medicine & Rehabilitation, Ex. 8F, Tr. 516-611; and Greenville

Psychiatry/Dr. Robert Richards' July 2018-May 2020 treatment notes, Ex. 9F, Tr. 612-52, and

August 1998-August 2020 treatment notes, Ex. 10F, Tr. 653-859.

Plaintiff contends the ALJ's inconsistency finding is incorrect because the ALJ refers to

the records of physicians who were not treating Plaintiff for mental impairments instead of the

records of her treating psychiatrist which Plaintiff argues "show the consistency required to

support his opinion." Pl.'s Br. 7-8 (describing Dr. Richards' records from October and July

2019). Plaintiff goes on to describe more fully the records cited by the ALJ that she claims the

ALJ misconstrued, *Id.* at 11-15, and other records that Plaintiff alleges had nothing to do with her mental health care but were cited by the ALJ to show "somewhat unremarkable" mental status examination findings, *Id.* at 15-17. Plaintiff argues that the "evidence shows that the ALJ did not properly consider Dr. Richards' opinion and the overwhelming consistent and supportive evidence in the record. The evidence also shows that the ALJ did not properly evaluate and consider the longitudinal record, but instead cherrypicked pieces of the record that were not representative." *Id.* at 17. The Commissioner contends that although Plaintiff "highlights her preferred evidence" none of that evidence compels an alternative finding to the ALJ's consideration of Dr. Richards' opinion. *Id.* at 17. The Commissioner further argues that "the ALJ appropriately considered mental status examinations from all providers, including Dr. Richards." *Id.* at 17-18. Responding to Plaintiff's argument that the ALJ mischaracterized the evidence, the Commissioner argues that "the ALJ fairly summarized the over 1700-page transcript and had no duty to discuss all aspects of every piece of evidence." *Id.* at 19 (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.")).

The ALJ next contends that Dr. Richards' additional proposed limitations "are not supported by nor necessitated by any specific objective findings, such as a need for four or more absences from work per month (14F/3)." Tr. 20. Plaintiff does not address this assessment by the ALJ in the portion of her brief dealing with Dr. Richards' opinion, but she does address the issue of her need for frequent absences as opined by Dr. Richards in her discussion of the impact of absences on her ability to work as testified to by the VE. Pl.'s Br. 22-23. Plaintiff cites to the record evidence regarding treatment appointments that she asserts supports the need for frequent absences. *Id.* at 23-24. The Commissioner argues that "Dr. Richards provided no explanation for

his guess that Plaintiff would miss that level of work (see Tr. 951). And Plaintiff specifically testified that her previous employment did not end because she missed too much work (Tr. 49)." Def.'s Br. 23.

The ALJ's third reason for finding Dr. Richards' opinion unpersuasive was because Plaintiff's "own reported and documented activities, including going to the gym regularly and house hunting in Florida, would be inconsistent with the suggested listing level mental impairment." Tr. 20. Plaintiff argues that the ALJ did not properly evaluate the record regarding her activities as outlined in her Function Report found at Exhibit 7E because he neglected to include the limitations placed on those activities. Pl.'s Br. 16-17. Plaintiff does not address the ALJ's house hunting comment. The Commissioner notes that in addition to the activities in the Function Report, the ALJ also noted Plaintiff's hearing testimony regarding house hunting in Florida. Def.'s Br. 15. The Commissioner argues that the ALJ considered conflicting medical opinions in accordance with the regulations and substantial evidence supports the ALJ's determination.

As an initial matter, in his RFC discussion the ALJ states that Plaintiff's "mental status examination findings have generally remained somewhat unremarkable[.]" Tr. 18. But then the records he chooses to discuss in detail are records that are *not* part of Plaintiff's mental treatment records, except for one October 31, 2019 group therapy session where Plaintiff's mood was described as euthymic and affect appropriate. Tr. 319 (Ex. 1F/5). The other records cited by the ALJ include an October 29, 2019 record from Piedmont Physical Medicine & Rehabilitation where Plaintiff presented for complaints of musculoskeletal pain and noted a recent 4-day trip to Disney World, Tr. 356 (Ex. 2F/6); and a November 18, 2019 visit with Dr. Gersh of Keystone Family Medicine for complaints of urinary incontinence where the doctor noted she had normal

19

mood and affect, and her behavior was normal, Tr. 498 (Ex. 7F/38). Interestingly, the ALJ did not mention that in that same record Dr. Gersh also noted Plaintiff's psychiatrist was attempting to change her medication to address anxiety symptoms. Tr. 495. The court notes that Dr. Richards' psychiatric treatment notes from the same time (October-December 2019) indicate Plaintiff's moods as depressed and anxious, sometimes also anhedonic, with blunted affect; often her thought content had preoccupations related to PTSD or stress; and in October 2019 she was also noted to have psychomotor slowing, slow speech, and racing thoughts in addition to her depressed and anxious mood. Tr. 615-41. So, if the ALJ's assessment is that Dr. Richards' 2020 opinion is "not supported by the numerous relatively normal to mild mental status examinations through the medical record" that statement is inaccurate. This is especially true because the ALJ does not cite specifically to which records he refers. The court must assume he is referencing the records cited in his RFC discussion, but again, those were not specifically mental status examinations (other than Dr. Kofoed's consultative examination which the ALJ found "only partially persuasive." Tr. 20.). As Plaintiff asserts, the ALJ did not provide a complete picture of the information contained in the records that could actually support Dr. Richards' opinion. While the ALJ did not have to discuss every piece of evidence, he should provide a complete analysis of the evidence he chooses to discuss.

Regarding the ALJ's second finding, the ALJ contends Dr. Richards proposed limitations (such as the need for four or more absences per month) are not supported or necessitated by objective findings; however, the court notes that the questionnaire did not ask Dr. Richards to provide support for this finding. Tr. 951. Plaintiff outlined several treatment records to show the number of medical appointments—including appointments with Dr. Richards—that she had in one month. Pl.'s Br. 23-24. This appears consistent with Dr. Richards' opinion that Plaintiff

would likely be absent from work more than four days per month due to her impairments or treatment. At the administrative hearing, in response to a hypothetical posed by the ALJ, the VE testified that if a worker had "three or more absences per month" the individual could not perform competitive employment. Tr. 60.

The ALJ's third finding dealt with Plaintiff's activities. The court agrees with the ALJ that the activities of going to the gym regularly and house hunting in Florida seem inconsistent with a listing-level mental impairment. However, the court cannot ignore Plaintiff's arguments regarding records or testimony that lend support to Dr. Richards' opinion. While the new regulations no longer give preference to treating physician opinions, ALJs still have the obligation identify the evidence relied upon and "'build an accurate and logical bridge from the evidence to his conclusion[.]'" *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Here, the ALJ has not provided enough information in his narrative so that the court can clearly follow his analysis of the evidence. As such, it is "incomplete and precludes meaningful review." *Monroe v. Colvin*, 826 F.3d at 191. The court remands the ALJ's decision for further consideration of Dr. Richards' opinion, along with further consideration of Plaintiff's remaining claims regarding the longitudinal record and the VE's testimony regarding absences.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine if the Commissioner's decision is supported by substantial evidence. The court hereby reverses the decision of the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g) and remands the matter to the Commissioner for further proceedings

consistent with this Order.

IT IS SO ORDERED.

August 4, 2023                                          Kaymani D. West
Florence, South Carolina                          United States Magistrate Judge